UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

In re:

Case No. 18-14255-13

CHAD T. OLSEN,

Debtor.

### **MEMORANDUM DECISION**

Chad Olsen ("Debtor") filed a chapter 13 petition in December 2018. On January 9, 2019, the Debtor proposed a Plan. On February 13, State Bank of Cross Plains ("State Bank") objected to confirmation. The Debtor filed an amended Plan on May 29. State Bank's objection remains.

#### BACKGROUND

The facts here are unique. The Debtor has no unsecured debt. There is no priority debt. He has only four secured creditors. He is and has always been current on payments to each secured creditor—with one exception. The only debt in default is a balloon payment owed to State Bank. The property securing this debt has substantial equity. But for certain conduct by State Bank, the Debtor would have remained current and would not have filed a petition. This is not a case of excess spending, lost employment, sudden medical bills, financial mismanagement, or the like. This is the case of a solvent Debtor undone by the unfair, deceptive conduct of his bank.

In August 2014, Overtime Trucking, LLC, and State Bank entered into a Business Loan Agreement and Promissory Note. The Debtor guaranteed the Loan Agreement by signing that Agreement and executing an Unlimited

Continuing Payment Guaranty. The Debtor also granted two mortgages to State

Bank to secure the loan. A parcel containing both the Debtor's business and

primary residence was the subject of the mortgages. Overtime Trucking pledged

all of its assets to secure the loan through a Commercial Security Agreement.

Before maturity of the Note, Debtor contacted an officer at State Bank

seeking to renew it. State Bank told him paperwork for renewal would have to

be prepared and signed. Just before the close of business on February 3, 2018,

the Debtor and State Bank executed another Promissory Note (the "Renewal

Note"). The Renewal Note had the same monthly payment amount as the

original Note. But instead of a renewal for a like term, it had a balloon payment

at the end of three months unlike the longer term in the original Note.[1] State

Bank does not dispute these facts.

The Renewal Note matured on May 3, 2018. Overtime Trucking defaulted

by failing to pay the required balloon payment of about $204,000.00 and, as a

guarantor, the Debtor defaulted by failing to pay the balloon. The Debtor was

surprised to learn the Note matured after just three months. While he did not

read the Renewal Note, he believed it had the same terms as the original Note.

In November 2018, State Bank obtained a judgment of foreclosure in the

amount of $214,267.09. The month after, before a foreclosure sale occurred,

the Debtor filed a bankruptcy. As of the petition date, the Debtor owed State

---

[1] The original Note is not in the record. The parties executed the original Note in
August 2014 and Renewal Note in February 2018. Based on these dates, the term of
the original Note was at least forty-three months.

Bank around $215,613.51. The parties stipulated the real property has a fair market value of at least $465,000.00. The Debtor has at least $100,000.00 of equity in the real property and is current on all taxes.[2]

The Plan proposes, on account of State Bank's claim, monthly payments of $1,785.00 at 4.88% interest until all administrative expenses are paid in full and then pro rata monthly payments of not less than $1,785.00 also at 4.88% interest. The Debtor proposes to refinance the remaining balance before the end of the Plan to pay State Bank in full through a balloon payment.

State Bank objects to confirmation. According to State Bank, the Plan "fails to comply with the Bankruptcy Code's Chapter 13 'cram-down' provisions." State Bank asserts its entire claim is arrearage because the Note matured prepetition. And the Plan purports to modify State Bank's treatment in contravention of sections 1322(b)(2) and 1325(a)(5) by proposing to extend the term of the loan for sixty months, forcing State Bank to accept monthly payments followed by a balloon payment.

State Bank's second argument is that the Plan is not feasible. The Bank contends a plan involving the need to refinance debt in five years is too speculative. The balloon payment should therefore be disallowed. The Debtor lacks the necessary income to make the equal monthly Plan payments of $3,593.56 State Bank says must be made in the absence of a balloon. Even if the balloon payment is allowed, State Bank says the Debtor still lacks the income necessary to make the Plan payments of $2,500.00 per month.

---

[2] Monona Bank holds a first priority secured claim in the amount of nearly $150,000.

**DISCUSSION**

A.  <u>Confirmation Standards</u>

A chapter 13 plan must meet the requirements of section 1325(a) to be

confirmed. The debtor has the burden of proving compliance with these

requirements by a preponderance of the evidence. The requirements are:

1) The plan must comply with chapter 13 and title 11;

2) All fees and charges assessed by the court under chapter 13 of title 28
   must be paid;

3) The plan must be proposed in good faith;

4) The value to be distributed to unsecured creditors must not be less
   than what they would receive in a chapter 7 liquidation;

5) With respect to each allowed secured claim—

   a)  the holder of such claim has accepted the plan;

   b)  the plan provides that—

       1. the holder of such claim retains the lien securing such claim
          until the earlier of the payment of the underlying debt or
          discharge, and if the case is dismissed or converted, such
          lien shall also be retained by such holder to the extent
          recognized by applicable nonbankruptcy law;
       2. the value, as of the effective date of the plan, of property to
          be distributed under the plan on account of such claim is
          not less than the allowed amount of such claim; and
       3. if the creditor stands to receive periodic payments, such
          payments must be in equal monthly amounts; or

   c) the debtor surrenders the collateral;

6) The debtor must be able to make all payments under the plan and
   must be able to comply with the plan;

7) The debtor must have filed the petition in good faith;

8) All domestic support obligations that became payable after the petition
   was filed have been paid; and

4

9) The debtor must have filed all required Federal, State, and local tax returns.

State Bank is the only party objecting to confirmation. The Bank raises two issues. It asserts the Plan is not feasible, even if the balloon payment is allowed. It also argues the balloon payment violates section 1325(a)(5)(B)(iii)(I). The Court takes each issue in turn.

     *i.*     *The Plan is feasible.*

Section 1325(a)(6) is known as the feasibility requirement for confirmation. It requires that the debtor "will be able to make all payments under the plan and to comply with the plan." To be feasible,

> the plan must have a reasonable likelihood of success as determined by the particular circumstances of the plan and the case. While the feasibility requirement is not rigorous, the plan proponent must, at minimum, demonstrate that the Debtor's income exceeds expenses by an amount sufficient to make the payments proposed by the plan. Because the issue of feasibility is one of fact, the determination by the bankruptcy court will not be disturbed unless the decision is clearly erroneous.

*Marshall v. Blake*, 885 F.3d 1065, 1083 (7th Cir. 2018) (citations omitted), *overruled on other grounds by In re Wade*, 926 F.3d 447 (7th Cir. 2019).

Chapter 13 plans are often funded from future income. Income projections "must be based on concrete evidence of financial progress and must not be speculative, conjectural or unrealistic." *In re Cherry*, 84 B.R. 134, 139 (Bankr. N.D. Ill. 1988). A debtor who is self-employed must show a positive earnings history, current income, and the likely stability of that income in the future. *In re Soppick*, 516 B.R. 733, 749 (Bankr. E.D. Pa. 2014).

The Debtor proposes paying State Bank's claim through equal monthly payments in the same amounts as were paid under the Note and Renewal Note before the balloon. A refinance and balloon payment would occur at or before the sixtieth month. While there is no *per se* bar on a provision to fund certain plan payments through a refinance, *In re Primes*, 518 B.R. 466, 481 (Bankr. N.D. Ill. 2014) (citing *Branigan v. Bateman (In re Bateman)*, 515 F.3d 272, 279 (4th Cir. 2008)), most cases hold that where the consummation of a plan "hinges entirely upon the happening of a speculative, contingent event, scheduled to occur some three to five years from the date of confirmation, such a plan does not meet the feasibility requirement of § 1325(a)(6)." *In re Isaac*, No. 05-B-13874, 2005 WL 3939839, at *2 (Bankr. N.D. Ill. Nov. 16, 2005).

Other courts view balloon payments with less skepticism. These courts hold that for a balloon payment to be feasible, "debtors must show by definite and credible evidence that they will have the financial ability to make the balloon payment. While it is impossible to predict with absolute certainty, mere speculation as to the source of funds is not sufficient to satisfy feasibility." *First Nat'l Bank v. Fantasia (In re Fantasia)*, 211 B.R. 420, 423 (B.A.P. 1st Cir. 1997) (citations omitted). Courts often consider the balloon payment under the totality of the circumstances, analyzing factors such as:

1) equity in the property at the time of filing, if any;
2) the debtor's future earning capacity;
3) the debtor's future disposable income;
4) whether the plan provides for the payment of interest to the secured creditor over the life of the plan;
5) whether the plan provides for payment of recurring charges against the property, including insurance and local property taxes; and

6

6) whether the plan provides for substantial payments to the secured creditor which will significantly reduce the debt and enhance the prospects for refinancing at the end of the plan.

*Id.* (citing *In re Brunson*, 87 B.R. 304, 312 (Bankr. D.N.J. 1988), *rev'd on other grounds*, *First Nat'l Fidelity Corp. v. Perry*, 945 F.2d 61 (3d Cir. 1991)); *see also Chelsea State Bank v. Wagner (In re Wagner)*, 259 B.R. 694 (B.A.P. 8th Cir. 2001) (applying similar factors); *Soppick*, 516 B.R. 733 (balloon payment should be considered under totality of the circumstances).

The Debtor's Plan is feasible. He is reasonably capable of making the required total monthly Plan payment of $2,500.00. The schedules show $8,000.00 per month in business income and $2,918.00 per month in business expenses (including taxes), leaving net monthly income of $5,082.00. ECF no. 11 at 21. After deducting living expenses of $2,582.00, the Debtor has $2,500.00 per month remaining for Plan payments. And the monthly payment to State Bank is in the amount made by the Debtor—without default—since 2004.

The volatility of the Debtor's income, according to State Bank, precludes a finding of feasibility. The Bank argues the Debtor's slow months (January through March) will cause him to fall behind. State Bank takes a too microscopic view of the Debtor's ability to make payments. The Court is being asked to confirm a *five-year Plan*. State Bank narrows its focus to two to three months out of the year to attack the Plan's feasibility. This argument is not persuasive.

The testimony of the Debtor was clear, convincing and credible. His good months more than compensate for the bad months. He acknowledges that the peak of winter can be slow because of the nature of his business. During those months he supplements his income with other work. And April and May 2019, for example, were good months for the Debtor. During that period, he had revenues of $27,555.00, or $13,777.50 per month. This leaves the Debtor with $3,670.16 per month after accounting for business expenses/taxes, living expenses, and the Plan payment.[3] The Debtor testified his good months were "pretty consistent." If he has nine good months outside January through March, he could have as much as $33,031.44 to cover the bad months. This is plenty. He has, and will, plan for this slow period using his increased revenues in other months to make up any shortfall. During the bad months, the Debtor is expected to fall behind only $10,352.04.  Since the Debtor is self-employed, he can adjust his workload to increase his income if necessary. He has also shown an ability to make the payments based on more than four years of doing so in the past. There was no testimony or other evidence to dispute that of the Debtor.

The Debtor's future income is stable and promising. He has future jobs lined up totaling $65,529.00. While the timeline in which the Debtor will perform these jobs is not stated, it is clear there is significant demand for his services. He has fifteen years of experience in the restoration business and a

---

[3] Business expenses were calculated using historical figures. The schedules list $8,000.00 per month in gross income and $2,918.00 per month in expenses. Thus, expenses constitute 36.475% of income.

positive reputation in the community. The Debtor proffered pictures confirming the quality of his work. He is also a "sole source" for such services in his geographic region.

The payment history and overall financial situation of the Debtor is significantly better than that of the typical debtor. He has no unsecured debt. The only secured debt he defaulted on was the balloon payment owed to State Bank. There is no evidence the Debtor has *ever* missed a payment other than that balloon.

In addition, a future refinance and balloon payment is not too speculative to preclude a finding of feasibility. The Debtor has nearly $100,000.00 of equity in the real property. He will continue to build equity as he pays down State Bank's claim. By the end of the Plan, the Debtor will have even more equity. As the Monona Bank first mortgage is reduced, State Bank's equity cushion will also continue to increase. Any appreciation in the value of the property gives the Debtor additional equity. *See In re McClaflin*, 13 B.R. 530, 533 (Bankr. N.D. Ill. 1981) ("unless the real estate market suffers a collapse, there is no reason to believe that the value of [the lender's] security will fall").

In addition to the significant equity cushion, other factors support the feasibility of a later refinance and balloon payment. The Debtor has a successful restoration business and stable future earning capacity as evidenced by the future jobs lined up. The Plan provides for an uncontested interest rate and direct payment of taxes and insurance, providing State Bank

with additional protection. As the Monona Bank first mortgage is reduced, State Bank's equity cushion will continue to increase.

State Bank defends its assertion the refinance is too speculative by noting the Debtor did not refinance prepetition or at any time during the case. This argument is not persuasive. Based on the Debtor's uncontested testimony, it appears State Bank lulled—or possibly misled—the Debtor into a false sense of security he was renewing the Note with State Bank with the same term as the original Note. Perhaps he would have had the opportunity to refinance with a different lender had State Bank been more transparent about its plan to deny a true renewal. By the time the Debtor realized that was not the case, his loan was in default. Thus, he was put in a position of trying to refinance a loan that was in default. He possessed little time to seek a refinance before State Bank started a foreclosure. The circumstances that created impediments to refinancing result from State Bank's failure to tell the Debtor in a timely fashion it was not truly willing to renew the Note. Instead, it created the impression it was doing so subject to some paperwork.

The totality of the circumstances confirms the feasibility of Debtor's Plan. For those reasons, the objection to confirmation on the ground of feasibility is overruled.

> ii.   *The Plan's treatment is a permissible modification under Section 1322(b)(2).*

A plan may "modify the rights of holders of secured claims, other than a claim secured *only* by a security interest in real property that is the debtor's principal residence . . . ." 11 U.S.C. § 1322(b)(2) (emphasis added). "Courts

10

have strictly construed this exception to limit its protection to purely consensual home mortgages when the creditor has taken no other security and the real estate has no use other than the debtor's principal residence." *In re Snowden*, 546 B.R. 39, 43 (Bankr. E.D. Ky. 2016) (quoting Keith M. Lundin & William H. Brown, *Chapter 13 Bankruptcy* § 119.1 at ¶ 1 (4th ed.). "A claim secured by real property that is, even in part, *not* the debtor's principal residence does not fall under the terms of § 1322(b)(2)." *Scarborough v. Chase Manhattan Mortg. Corp. (In re Scarborough)*, 461 F.3d 406, 411 (3d Cir. 2006). *See also In re Morphis*, 30 B.R. 589 (Bankr. N.D. Ala. 1983).

That is not the case here. State Bank's claim is secured by a single parcel of real estate. It contains both the Debtor's principal residence and his place of business. The business facilities are not merely incidental to the residence. 11 U.S.C. § 101(27B). Instead, it has real commercial activity. It permitted Debtor to expand and improve the business facility. The undisputed testimony is that at the time of the transaction the Debtor and State Bank intended to enter into a commercial—not a residential—transaction. It was a business loan intended to be used for commercial purposes to produce business income. That the real estate also contains Debtor's residence does not change those facts.

Although there is not extensive legislative history, the purpose of the statute "is to protect the stability and affordability of the residential lending market . . . while at the same time provid[ing] debtors a limited remedy of default cure in Chapter 13 to save homes that are in peril of foreclosure." *In re*

11

*McConnell*, 296 B.R. 197, 200 (Bankr. D. Minn. 2003). Tracing the history of

the section, the *McConnell* court found:

> The legislative history says little in terms of political or social philosophy as such. However, it does reveal that the final language of section 1322(b) evolved from earlier language, incorporated in the bill apparently at the behest of representatives of the mortgage market, that would have prohibited modification of the rights of all creditors whose claims were wholly secured by mortgages on real property. Although the earlier language did not survive, the statute as finally enacted by Congress clearly evidences a concern with the possible effects the new bankruptcy act might have upon the market for homes.

*Id.* at 200.

Quoting from *In re Glenn*, 760 F.2d 1428, 1433 (6th Cir. 1985), the

*McConnell* court noted:

> On the other hand, Congress was determined not to depart too far from its expressed policy of making wage earner plans more attractive to debtors, especially as an alternative to full bankruptcy proceedings under Chapter 7. Therefore, the preferred status granted some creditors under section 1322(b)(2) was limited to holders of claims secured only by a security interest in the debtor's principal residence. No preferential treatment was given debts secured by property in addition to the debtor's principal residence. Such debts normally are incurred to make consumer purchases unrelated to the home or to enable the debtor to engage in some form of business adventure. In such circumstances the home is mortgaged not for its own sake, but for other purposes, and often is only one of several forms of security given. In a consumer purchase the creditor may also take a security interest in the goods purchased, or in a business transaction, the value of the home may be an insufficient security and, therefore, form only a part of the security package. Congress granted no extra protection for holders of these types of secured claims, presumably because any impact the bankruptcy laws might have upon them would not seriously affect the money market for home construction or purchase.

*McConnell,* 296 B.R. at 201-202.

The power granted by section 1322(b)(2) includes the ability to unwind a mortgage that matured prepetition and pay it over the life of the plan. *See, e.g.*, *Congrove v. N. Hancock Bank & Trust Co. (In re Congrove)*, 485 B.R. 841, 846 (Bankr. N.D. Ohio 2013) (chapter 13 plan may provide for payment of a debt secured by the debtor's principal residence by full payment over the life of the plan, even though the original obligation matured prepetition); *In re Fortin*, 482 B.R. 35, 41 (Bankr. D. Mass. 2012) (same); *In re Ibarra*, 235 B.R. 204, 211 (Bankr. D.P.R. 1999) (same).

Here, the Debtor may modify the rights of State Bank. State Bank's claim is secured not only by the Debtor's principal residence but by his business property as well. The Debtor lives on the real property. But the property is not solely his residence. Instead, it includes his place of business. He generates substantial income from the operation of his business. The loan was intended for that very purpose. There is also other collateral securing the loan pledged by the Debtor's business. The anti-modification provisions do not apply because the loan is *not* secured only by the Debtor's principal residence. For these reasons, the Plan satisfies section 1322(b)(2).

> iii.    *The Plan's treatment is a permissible modification under Section 1325(a)(5)(B)(iii)(I).*

In addition to the requirements of section 1322(b)(2), however, the requirements of section 1325(a)(5) must be satisfied. The ability to modify the rights of holders of secured claims is qualified by section 1325(a)(5), that provides:

13

(5) with respect to each allowed secured claim provided for by the plan—

    (A) the holder of such claim has accepted the plan;

    (B)    (i) the plan provides that—

        (I) the holder of such claim retain the lien securing such claim until the earlier of—

            (aa) the payment of the underlying debt determined under nonbankruptcy law; or

            (bb) discharge under section 1328; and

        (II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law;

    (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and

    (iii) if—

        (I) *property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts*; and

        (II) the holder of the claim is secured by personal property, the amount of *such* payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or

    (C) the debtor surrenders the property securing such claim to such holder.

11 U.S.C. § 1325(a)(5)(A)–(C) (emphasis added).

14

State Bank does not accept its treatment under the Plan as evidenced by its objection. Nor does the Plan propose to surrender State Bank's collateral. Thus, to be confirmable, the Plan must satisfy section 1325(a)(5)(B).

The parties do not dispute State Bank's claim must be paid in full during the Plan. At issue is whether the proposed treatment of State Bank's claim is a permissible modification under section 1325(a)(5)(B)(iii)(I).

There are majority and minority interpretations of section 1325(a)(5)(B)(iii)(I). The majority holds this subsection prohibits balloon payments. *See, e.g.*, *In re Miceli*, 587 B.R. 492, 502 n.13 (Bankr. N.D. Ill. 2018) (noting the "nearly universal line of cases which ha[ve] held that the subsection prohibits balloon payments"). These cases argue a balloon payment is part of the stream of periodic payments. It follows that the monthly payments and eventual balloon payment are periodic payments not in "equal monthly amounts." But none of these cases are controlling law in the Seventh Circuit.

A growing minority view interprets the "periodic payments" language differently. As noted in *In re Cochran*, 555 B.R. 892, 897–98 (Bankr. M.D. Ga. 2016):

> Because "periodic" payments are regularly reoccurring and balloon payments are not, balloon payments are not "property to be distributed ... in the form of periodic payments" and, consequently, are outside the scope of § 1325(a)(5)(B)(iii)(I). This conforms with the common and technical understanding of these terms. For example, *Webster's Third New International Dictionary* defines "periodic" as something that is "characterized by periods," occurs "at regular intervals," and occurs "repeatedly from time to time." *Black's Law Dictionary* defines a "periodic payment" as "[o]ne of a series of payments made over time instead of a one-time payment for the full amount." While it is obvious that the balloon payment cannot itself

be reoccurring, one could argue that such payment is merely the last of the series of reoccurring payments. However, this is inconsistent with *Black's* use of these terms. *Black's* defines a "balloon payment" as "[a] final loan payment that is usually much larger than the preceding *regular payments* and that discharges the principal balance of the loan." In defining "balloon payment," *Black's* references the definition of "balloon note": "A note requiring small *periodic payments* but a very large *final payment. The periodic payments* usually cover only interest, while *the final payment (the balloon payment)* represents the entire principal." These definitions establish that a final, balloon payment is distinct and separate from the preceding "periodic payments." Accordingly, it is only the periodic payments—and not the balloon payment—that are subject to the "equal monthly amounts" directive of § 1325(a)(5)(B)(iii)(I).

*Id.* (citations omitted) (emphasis in original).

Other recent authorities agree with the minority interpretation. "The term 'periodic payments' could be construed to mean regular, recurring payments that are made to reduce a secured claim during the plan's term but not to a final one that completely satisfies it. A regular installment payment or payment of interest on the debt is a 'periodic' one, whereas a lump sum payment is not . . . . [T]his interpretation of 'periodic payments' accomplishes the primary objective of the new provisions of Code § 1325(a)(5)(B)(iii) . . . ." Hon. W. Homer Drake, Jr., Hon. Paul W. Bonapfel, & Adam M. Goodman, *Chapter 13 Practice & Procedure* § 5:18 (2016). *See also* Lynn M. LoPucki, *House Swaps: A Strategic Bankruptcy Solution to the Foreclosure Crisis*, 112 MICH. L. REV. 689, 729–33 (2014) ("Had the drafters . . . intended [section 1325(a)(5)(B)(iii)(I)] to prohibit balloon payments and periodic payments, the drafters would have said 'all plan payments' instead of 'such payments.'").

16

"The purpose of section 1325(a)(5)(B)(iii)(I) is not set forth in the statute and the legislative history is silent." *In re Shelton*, 592 B.R. 193, 202 (Bankr. N.D. Ill. 2018). Courts have struggled to find primary sources detailing the legislative purpose behind section 1325(a)(5)(B)(iii)(I). *See Cochran*, 555 B.R. at 901–02 ("Upon the Court's review, cases prohibiting balloon payments as contrary to the history or purpose of § 1325(a)(5)(B)(iii)(I) do so based on unsupported judicial speculation, rather than formal legislative history . . . . This lack of cited authority is not surprising, as the only formal legislative history found by this Court . . . merely echoes the wording of the subsection, without any insight as to the purpose of its enactment.").

Some courts have opined the purpose is to "prevent the manipulation of payments to secured creditors without the consent of the affected creditors." *Shelton*, 592 B.R. at 202. By requiring equal monthly payments, this section "prevents debtors from ballooning payments to such creditors (delayed creditors), thereby shifting the risk of early failure of plans to be borne by the delayed creditors . . . ." *Id.* The legislative purpose of the statute is:

> [I]t seems that Congress intended to give creditors more certainty and regularity as to any proposed [sic] stream of payments. Requiring any stream of payments to be equal falls within the periodic payments language and functions in tandem with Congress's concerns over protecting holders of claims secured by personal property (as evident from § 1325(a)(5)(B)(iii)(II)). Accordingly, the Court determines that Congress had reasons other than prohibiting balloon payments in enacting the equal payment provision—reasons that fit more naturally with the language of the statute, and that are not implicated by the Debtor's Plan.
>
> . . .

17

Moreover, the majority rule runs against the grain of Chapter 13's underlying purposes. "In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." The interpretation argued by the [majority] would go against Congress's intent to provide a flexible means for the debtor to protect his assets, most importantly those assets necessary to pay his creditors by completing his plan, such as a house to live in or car to drive to work. This flexibility is evident in the structure of Chapter 13 itself. This flexibility is further reflected in the legislative history.

*Cochran*, 555 B.R. at 904 (citations omitted).

Indeed, chapter 13 debtors should be afforded flexibility in crafting their plans. Flexibility is critical to achieving the Congressional goal of encouraging chapter 13 instead of chapter 7. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 117–18 (1977). One court held:

Permitting the Debtor to structure his plan with affordable payments for the next five years and the opportunity to refinance in month 60 using the equity in his home is "consistent with the Congressional intent to provide Chapter 13 debtors with flexibility in structuring their plans[.] . . . [T]he policy behind Chapter 13 is to encourage individuals to pay their debts as opposed to simply obtaining a discharge under Chapter 7. We recognize this statutory goal and seek to preserve it."

*In re Ramirez*, No. 13-20891-AJC, 2014 WL 1466212, at *4 (Bankr. S.D. Fla. Apr. 7, 2014) (quoting *In re Ferguson*, 134 B.R. 689, 695 (Bankr. S.D. Fla. 1991)).

The *Ramirez* court permitted a balloon payment at the end of a five-year plan. *Ramirez*, 2014 WL 1466212, at *4. Although *Ramirez* was in the context of a feasibility analysis, the court noted several key facts in affording the debtor flexibility in forming a plan. The debtor was employed. *Id.* at *3. The plan provided for interest. *Id.* The debtor proposed to pay nearly half of the claim

during the plan, "a factor strongly weighing in favor of permitting the balloon payment." *Id.* Finally, the plan would leave "significant equity in the home at the end of 5 years such that refinancing is reasonably certain." *Id.*

While the majority interpretation may be proper in some contexts, the unique facts of this case unequivocally warrant application of the minority view. Congress did not enact this subsection with the present facts in mind. The Debtor has no unsecured debt. There is no evidence he *ever* missed a payment other than the balloon. This is not the case of a shaky debtor on the brink of financial turmoil. The Debtor here has an excellent payment history. He was misled by State Bank's failure to tell him the Note was merely being extended for three months and not being renewed on the same terms as the original Note. The same monthly payment plus the representation that paperwork was needed for renewal reinforced his understanding the Note was being renewed on the same terms, thus creating the impression he need take no other action to refinance the original loan.

Section 1325(a)(5) is designed to prevent taking advantage of innocent creditors. That is not the case here. State Bank is not the innocent creditor. It appears here with unclean hands. The Bank—either through actual misrepresentation or omission of material facts—led the Debtor to sign a Renewal Note when it knew or should have known the Debtor was unaware the Note had a three-month term. It is inequitable to grant State Bank relief when its conduct is the predominant reason this case exists in the first place.

The Plan does not unfairly shift the risk of the Plan's failure to State Bank. The Bank faces minimal risks. The Debtor has significant equity and will continue to build equity as he makes Plan payments. Should the Debtor default, State Bank can foreclose and realize the full value of its claim through the significant and increasing equity cushion.

The importance of affording the Debtor flexibility in crafting a plan is highlighted by the facts here. State Bank holds an over-secured claim and will be receiving payments until it is paid in full or granted relief from stay in the event of default. There has been no suggestion the real property is declining in value. State Bank suffers little, if any, risk of harm. On the other hand, the Debtor faces losing his homestead and place of business even though he has proposed a feasible Plan to pay off State Bank within a relatively short period. As noted by *Ramirez*, permitting a flexible approach enables the Debtor to reorganize under chapter 13, rather than simply liquidate and seek a discharge under chapter 7.

The facts here are even more favorable to the Debtor than in *Ramirez*, where the court emphasized a flexible approach in allowing a plan with a balloon payment at the end of the fifth year. As in *Ramirez*, the Debtor is employed. It is uncontested that under the Plan he will reduce the principal balance on State Bank's loan by more than $60,000 before the balloon unless refinancing occurs sooner. The significant equity in the real property will only increase as the first mortgage payments and payments to State Bank are made.

20

The Debtor here, unlike the debtor in *Ramirez*, has no unsecured creditors and is current on all other debts.

Permitting the balloon payment furthers the policies underlying the Bankruptcy Code. The Code is designed to (1) grant a fresh start to the honest but unfortunate debtor and (2) repay creditors. The balloon achieves both. The Debtor here is the honest but unfortunate debtor. There is no evidence he has *ever* missed a payment other than the balloon. He missed the balloon payment only because he was unaware it was required. The Plan also ensures State Bank will be paid in full whether or not the Debtor completes the Plan. If the Debtor completes the Plan, State Bank is paid in full. If the Debtor does not, State Bank can seek relief from stay and is protected by the significant equity cushion. The Plan satisfies the requirements of section 1325(a)(5). The objection of State Bank on the grounds of section 1325(a)(5) is overruled.

B. State Bank is equitably estopped from objecting to the Plan.

Equitable estoppel focuses on the conduct of the parties. *Milas v. Labor Ass'n of Wisconsin, Inc.*, 214 Wis. 2d 1, 11 (Wis. 1997). It is a bar to the assertion of what would otherwise be a right; it does not itself create a right. *Murray v. City of Milwaukee*, 252 Wis. 2d 613, 625 (Wis. Ct. App. 2002). Equitable estoppel is not limited to actions brought in equity and may apply to preclude assertion of rights and liabilities under a note or contract. *Gabriel v. Gabriel*, 57 Wis. 2d 424, 428 (Wis. 1973). A party asserting equitable estoppel bears the burden of proving each element by clear and convincing evidence. *Id.* Proof of estoppel may not rest on mere inference or conjecture. *Id.*

21

In Wisconsin, there are four elements to a defense of equitable estoppel: (1) action or non-action, (2) by the party against whom estoppel is asserted, (3) which induces reasonable reliance by the other party, and (4) which is to the relying party's detriment. *E.g.*, *Village of Hobart v. Brown Cty.*, 281 Wis. 2d 628, 647 (Wis. 2005).

Even if the majority view of section 1325(a)(5)(B) applied, State Bank would be estopped from objecting to a Plan so long as the repayment schedule thereunder were no longer than the term of the original Note. State Bank's conduct constituted both action and inaction. The Debtor called State Bank about a renewal. State Bank informed the Debtor paperwork needed to be prepared and signed for him to renew. The Bank had the Debtor come to its office and sign paperwork under the guise of a renewal. State Bank gave him a Note to sign. The Bank's inaction was failing to inform the Debtor it would not renew on the same terms or that the Renewal Note contained a three-month balloon.

The Debtor relied on State Bank's conduct in signing the Renewal Note. The Debtor believed, based on State Bank's representations, the Renewal Note had the same terms as the original Note. Reliance harmed the Debtor, as the failure to pay the balloon led to a foreclosure judgment and the filing of a bankruptcy petition.

The remaining issue is whether the Debtor's reliance was reasonable. In other words, does the Debtor's failure to read the Renewal Note preclude the application of equitable estoppel?

Wisconsin courts have considered this issue in the context of insurance disputes. "[F]ailure to read the [insurance] policy does not constitute such lack of diligence or negligence as to bar the insured from invoking the principle of estoppel against the defendant insurance company." *Emmco Ins. Co. v. Palatine Ins. Co.*, 263 Wis. 558, 567 (Wis. 1953). The Wisconsin Supreme Court continued:

> Everyday experience underlies the rule that it is not necessarily negligence for the applicant for insurance to fail to read the application or the policy . . . . Ordinarily persons making contracts of insurance do not read carefully the application, and a very small per cent, in all probability, of those securing insurance, ever read or understand the contents of the policy.

*Id.* at 568 (quoting *Taluc v. Fall Creek Farmers' Mut. Fire Ins. Co.*, 234 N.W. 364, 365 (Wis. 1931)).

The meaning of the term "renewal" is straightforward. *Black's Law Dictionary* defines "renewal" as "[t]he act of restoring or reestablishing." *Renewal*, *Black's Law Dictionary* (10th ed. 2014). It defines "renewal note" as a "note that continues an obligation that was due under a prior note." *Renewal note*, *Black's Law Dictionary* (10th ed. 2014).

The Debtor's reliance was reasonable even though he failed to read the Renewal Note. As in insurance contracts, it is unlikely the average consumer under these circumstances would have read the Renewal Note. The parties had a banking relationship for more than three years when they executed the Renewal Note. The Debtor was diligent in contacting State Bank before maturity of the original Note. He was simply told paperwork was needed for the

23

renewal and would be prepared for his signature. He came to the Bank and signed the Note given to him by the banker. He was told the payment was the same. He was not told the term was a mere three months. These facts are undisputed. The Debtor trusted and relied on the Bank. The execution occurred at the end of the business day. It is unclear if the Debtor even had time to review the Note before the Bank closed.

The Debtor's belief about the term of the Renewal Note comported with the general understanding of "renewal" and "renewal note." The average consumer would believe a renewal would be just that—a renewing or continuation of a previous obligation under the same terms. His belief was affirmed when State Bank accepted monthly payments in the same amount as under the original Note.

State Bank unjustifiably failed to correct the Debtor's misunderstanding until after the Note matured and the balloon was past due. There is no evidence the Bank walked him through the Renewal Note or in any way conveyed the term would be only three months. Nor did State Bank notify him a balloon payment would soon be due. State Bank sat idly by and let this unfortunate situation unfold, with no regard for the Debtor's welfare.

Even if the majority interpretation of section 1325(a)(5)(B)(iii)(I) might apply, based on the principles of estoppel, while the Plan *as written* might not be confirmable, it would be confirmable if it proposed 42 equal monthly payments followed by a balloon payment.

24

C. <u>An alternative equitable remedy is to reform the Renewal Note to match the terms of the original Note</u>.

The original and Renewal Note identify Wisconsin law as the governing law. In Wisconsin, contract reformation is an equitable remedy. *Jewell v. United Fire & Cas. Co.*, 25 Wis. 2d 509, 517 (Wis. 1964). The facts necessary to a reformation claim must be shown by clear and convincing evidence. *Hennig v. Ahearn*, 230 Wis. 2d 149, 177 (Wis. Ct. App. 1999).

"Reformation of a written instrument is appropriate when the instrument fails to express the intent of the parties . . . because of the mistake of one party coupled with fraud or inequitable conduct of the other." *Id.* at 174. "It is sufficient for contract reformation that one party is mistaken as to a material term of a writing and that the other knows of this mistake and fails to point it out." *Id.* at 175 (citing *City of Milwaukee v. Milwaukee Civic Devs., Inc.*, 71 Wis. 2d 647, 653 (Wis. 1976) (citing Restatement of Contracts § 505 (1932)). *See also General Cas. Co. of Wisconsin v. Choles*, No. 2009AP832, 2010 WL 958028, at *2 (Wis. Ct. App. Mar. 18, 2010) (in an insurance contract dispute, recognizing "[t]he average individual accepts the policy tendered relying upon the assurance on the part of the insurer, express or implied, that the policy affords him the coverage desired").

Reformation dates back to the time of execution of the contract to be reformed. *Milwaukee Civic Devs., Inc.*, 71 Wis. 2d at 654. "Courts may thereafter proceed to enter such relief as is appropriate in light of the reformed instrument." *Id.*

25

The Court can reform the Renewal Note to match the Debtor's intent of renewing the original Note with the same terms. The term of the Renewal Note is material to the overall agreement. State Bank knew the term was only three months. The Debtor did not. The Bank failed to correct or otherwise point out his mistake.

The Bank knew or should have known about the Debtor's mistake. The Debtor called State Bank seeking to renew the Note on the same terms. The Debtor continued making the same monthly payment. State Bank never informed the Debtor a balloon payment would soon be due. Nor did the Bank ever walk the Debtor through the Renewal Note and explain the terms therein.

State Bank's conduct was inequitable. Asymmetrical financial sophistication existed between the parties. This transaction was not at arms' length. State Bank was in a position of superior bargaining power. Armed with more experience, it exploited the Debtor. Finding in favor of State Bank results in an unfair windfall to an undeserving creditor whose distasteful conduct placed the Debtor in an untenable position of having to file for bankruptcy to save his home and business.

Like the estoppel argument, applied to the facts here reformation affords the Debtor the right to confirmation of a Plan with monthly payments to State Bank of $1,785.00 followed by a balloon payment. The appropriate relief under the facts and principles of reformation would be a term of not less than 42 months from the first payment under the Plan followed by a balloon.

26

**CONCLUSION**

For these reasons, the Court confirms the Plan. It is feasible. Given the unique facts of this case, a balloon payment as proposed is permissible.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

 A separate order consistent with this decision will be entered.

Dated:  July 22, 2019

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge